[No. 949.]

## MAHER AND TOUSIGNANT, RESPONDENTS, *v.* S. T. SWIFT, APPELLANT.

SALE OF PERSONAL PROPERTY MADE TO HINDER, DELAY, AND DEFRAUD CREDITORS—FRAUDULENT GRANTORS CAN NOT RELY UPON THEIR OWN FRAUD.—M. and T., being indebted to divers persons, made, executed, and delivered to B. a bill of sale of certain personal property, for the purpose of hindering, delaying, and defrauding their creditors, and thereafter allowed B. to have an equivocal possession of the property and to hold himself out to the world as the true owner. E., a creditor of B., levied upon the property: *Held*, That the original transfer of the property to B., though fraudulent as to the creditors of M. and T., was valid between M. and T. and B.; that the bill of sale vested the legal title in B., and that the property was thereafter liable to be seized as his property at the instance of his creditors; and that M. and T. could not set up their own fraud in order to defeat the rights of such creditors.

IDEM—SURRENDER OF BILL OF SALE.—The bill of sale was surrendered, and the property delivered by B. to M. and T. prior to the levy by E.: *Held*, That such surrender and delivery did not defeat E.'s rights as a creditor of B. Such surrender and delivery having been made without any valid consideration.

IDEM—ADMISSIBILITY OF EVIDENCE.—The court excluded a sworn complaint made by B. after the transfer to him, that he was the absolute owner of the property, it being shown by the testimony of M. that he knew of, and consented to, B's filing the complaint: *Held*, error.

IDEM.—The court excluded the conversations and declarations of B. to divers parties, that he was the owner of the property: *Held*, error.

ERRORS AGAINST RESPONDENT CAN NOT BE CONSIDERED.—The supreme court will only consider such questions as are assigned as error by appellant.

APPEAL from the District Court of the Second Judicial District, Ormsby County.

The facts are sufficiently stated in the opinion.

*Wells & Stewart* and *A. C. Ellis*, for Appellant.

I. The court erred in excluding defendant's questions to the witnesses Bovard, Stadtmuller, Hoover and others, to the effect that Bovard claimed the property as his own.

II. The court erred in excluding the sworn complaint of the witness Bovard against S. T. Swift, defendant, for a portion of the property in controversy. (*Gallagher* v. *Williamson*, 23 Cal. 331; 12 Nev. 38; 7 Cal. 391; 8 Id. 109; 12 Pick. 89 and 306.)

III. The court erred in excluding the following questions put to witness Elder by the defendant, upon the plaintiff's objection, to wit:

"Were you told by any one, before the levy of the execution in the case of Bovard against Elder, that Maher, plaintiff in the case, had stated that the property in controversy, or any part thereof, was the property of Bovard, the execution debtor?" (*Mitchell* v. *Reed*, 9 Cal. 204; *Goodale* v. *Scannell*, 8 Id. 27; *Chapman* v. *O'Brien*, 34 N. Y. Sup. Ct. 524; *Horn* v. *Cole*, 51 N. H. 287; *Stevens* v. *Dennett*, Id. 324.)

*Robert M. Clarke* and *N. Soederberg*, for Respondents.

I. The facts pleaded and sought to be proved were insufficient to establish an equitable estoppel. (*Sharon* v. *Minnock*, 6 Nev. 386; *Ward* v. *Carson Riv. Wood Co.* 13 Nev. 44; Bigelow on Estoppel, 480-600; 4 Saw. 17; 55 N. Y. 229; 14 Cal. 368; 109 Mass. 57.)

II. The conduct of plaintiff upon the seizure of his property by the sheriff, was properly allowed in evidence. (1 Green. Ev. sec. 108.

III. There was no judgment ever entered by the court in the case of *Bovard* v. *Elder*, and hence the execution under which defendant attempted to justify was a nullity.

By the Court, HAWLEY, J.:

This action was brought to recover twenty-six animals (horses and mules), seven wood wagons, and other personal property connected therewith, or the value thereof.

The defendant, Swift, in his official capacity as sheriff of Ormsby county, levied upon, took possession of, and sold the property by virtue of a writ of execution in favor of George S. Elder, in the suit of *C. M. Bovard* v. *George S. Elder*, as the property of said Bovard.

Plaintiffs obtained judgment. Defendant appeals.

The testimony is quite voluminous, and is, in several particulars, somewhat conflicting and very unsatisfactory.

The property in controversy was purchased by the plaintiffs from different parties, mostly on credit, prior to the thirty-first day of October, 1877.

A portion of the property—"eight animals, four wagons and twelve harness"—was purchased from C. M. Bovard for the sum of one thousand dollars. Two notes of five hundred dollars each were given to Bovard—one became due in September and the other in October, 1877. The note that became due in September was paid. The other was not.

On the thirty-first day of October, 1877, the plaintiffs agreed with C. M. Bovard that the property purchased from him should be returned; that he should become the owner of the property, and should pay to plaintiffs five hundred dollars and surrender their note for the other. Bovard then paid one thousand dollars to Maher & Tousignant. M. & T. paid back to Bovard the sum of five hundred dollars, and Bovard surrendered the unpaid note to M. & T. The plaintiffs thereupon executed and delivered to said Bovard a bill of sale for "thirty-two head of animals, six wood wagons, a kit of blacksmith tools, and harness for the thirty-two animals."

This bill of sale was executed for the purpose of avoiding anticipated trouble with one James Mayberry, on account of the plaintiff's failure to complete a contract with him for hauling wood. Maher, in his testimony, says: "We hadn't finished our contract; * * * we wanted to get a settlement out of Mayberry, and we were afraid he would take the stock for damages, because the contract wasn't finished. Therefore, we executed this bill of sale to save ourselves. That is what it was given for." In the course

of his testimony, he admitted that the object in executing the bill of sale was to prevent Mayberry from getting the property, if he had any claim against them for not completing their contract.

Bovard, in his testimony relating to the same transaction, says: "The property described in the bill of sale * * * was got from Lufkins, Perry, and Hager. I had no interest in this property before this bill of sale had been made; never had any interest in it before. I had no interest with the plaintiffs * * * in hauling wood or freighting wood for Mayberry. The bill of sale was made because they thought that Mayberry would probably attach their stock and prevent them from taking it out of there on account of their not fulfilling their contract. * * * They gave me that bill of sale and I gave Mr. Tousignant one thousand dollars. * * * Mr. Maher and Mr. Boyd were called in as witnesses. Then Maher and I went out into a little office they had there and he gave me back the money, and I took it in, and I counted the money over to Mr. Maher, the same one thousand dollars, and gave it to him, and he gave it to Mr. Tousignant. * * * No other consideration or thing passed between me and these people for the property, except as I have stated." It does not appear from the record on appeal that Mayberry ever made any demand against the plaintiffs; that he ever brought any suit or obtained any judgment against them.

The jury, upon special issues submitted to them, found that Bovard did not, at any time, after the execution and delivery of the bill of sale, have the entire and exclusive possession and control of the property mentioned therein; that in the month of November, 1877, it was agreed between the parties that Bovard should have the use and possession of the property in question and receive the earnings of the same until the amount of one thousand dollars was realized, over and above expenses, and that then the Bovard property, to wit, "eight animals, four wagons, and harness," should belong to the plaintiffs; that Bovard, while using the property, was unable to pay the expenses of the same; that on the twenty-ninth of January,

A. D. 1878, the plaintiffs and Bovard had a full and final settlement; that the plaintiffs executed and delivered to Mrs. Bovard, at the instance of the said C. M. Bovard, their notes for the sum of one thousand dollars, originally due to said Bovard for the purchase of the property, and the additional amount of two hundred and fifty-seven dollars and ten cents, the expenses incurred by Bovard while using the property; that Bovard thereupon surrendered and delivered to plaintiffs the bill of sale; that after the twenty-third day of December, 1877, the plaintiffs had the exclusive possession, use and control of the property, up to and including the fourth day of February, 1878, when the defendant levied upon and took possession of the same as the property of C. M. Bovard; that the plaintiff, Maher, after the month of November, 1877, "and previous to the levying of the execution, declared to two or more persons, not in confidence, that the property in controversy belonged to C. M. Bovard."

The majority of the members of this court entertain the opinion that the facts of this case bring it directly within the legal principles decided in *Allison* v. *Hagan*, 12 Nev. 38.

The record contains abundant evidence to show that at the time of the fraudulent transfer of the property to Bovard the plaintiffs were indebted to divers persons; that after that transaction occurred they allowed Bovard to have, at least, an equivocal possession of the property, and to hold himself out to the world as the true owner. They at divers times asserted, for the purpose of misleading their creditors and preventing them from attaching, that Bovard was the owner of the property.

Between the first and fifteenth of December, 1877, a member of the firm of Stadtmuller & Co., at Empire, called upon the plaintiff Maher and requested payment of the amount that Maher owed the firm. Maher represented to him "that Bovard owned everything, teams and wagons and all; that he had sold everything to Bovard."

On the twentieth of December, 1877, M. C. Tilden brought suit against Maher & Tousignant and attached part of the property in controversy in this suit. After the attachment

was levied Maher told Tilden that he did not own the property, and that it belonged to Mr. Bovard.

The bill of sale was always exhibited and used, or attempted to be used, as a cloak to hide the truth from their creditors.

The evidence which was admitted at the trial tends very strongly to show, if it does not clearly establish the fact, that the plaintiffs and Bovard acted in concert for the purpose of shielding each other from the legal rights of their lawful creditors. When any creditor of the plaintiffs sought to obtain a lien upon the property, Bovard claimed it, and the plaintiffs said it belonged to him. When the creditor of Bovard seeks to obtain a lien upon it as the property of Bovard, then the claim is made that it belongs to the plaintiffs, and Tousignant declares that "it was pretty hard for his property to go to pay another man's debts." Bovard also says that the property belongs to the plaintiffs. It then appears that the ubiquitous bill of sale, after having served its fraudulent purpose in one case and failed so to do in another, had been voluntarily surrendered up to the plaintiffs, so that they might exhibit it for the fraudulent purpose of frightening another class of creditors, for the payment of whose debts the property had in the mean time become liable. In brief, the fraudulent purpose of the whole transaction, from beginning to end, is exposed to view upon nearly every page of a very voluminous record.

The original transfer of the property to Bovard, though fraudulent as to the creditors of Maher & Tousignant, was perfectly valid as between the parties to the bill of sale. It vested the legal title in Bovard. The property was thereafter liable to be seized as his property at the instance of any of his creditors. The plaintiffs can not set up their own fraud in order to defeat the rights of such creditors. Having made their bed in fraud, there they must lie. The aid of a court of justice can not be invoked to relieve them from their own iniquity. In order to establish their rights they must show that the justice of their case comes from a pure fountain. The law endeavors to environ every debtor who engages in transactions of this character with all pos-

sible perils and, by its stern mandate, seeks to enforce upon his mind that, in weal or woe, "honesty is the best policy."

The bill of sale having been surrendered, and the property delivered by Bovard to the plaintiffs prior to the levy of the execution, will not defeat Elder's rights as a creditor of Bovard, such surrender and delivery having been made, as is clearly shown by the testimony, without any valid consideration.

Entertaining these views, it necessarily follows that the court below erred in several particulars.

The action of the court in giving and refusing certain instructions was at variance with the views herein expressed, and directly in conflict with the principle of law, as stated by this court, in the case of *Allison* v. *Hagan*, as will readily be seen by a mere recital thereof.

At the request of plaintiffs' counsel the court instructed the jury as follows: "The jury are instructed that if they believe from the evidence that prior to February 4, A. D. 1878, C. M. Bovard had a settlement with the plaintiff concerning all matters of difference between them concerning the property in question, and that prior to said fourth day of February, A. D. 1878, it was agreed between them that the property in question should belong to the plaintiffs, and that plaintiffs should have the use and control and possession of said property, and that the bill of sale of October 31, A. D. 1877, was surrendered by Bovard to the plaintiffs, and that at the time the defendant took the property said C. M. Bovard was not in the possession of the said property, and the plaintiffs were in the possession thereof, then the jury must find a verdict for the plaintiffs."

The defendant asked the court to instruct the jury as follows: "The jury are instructed that the return by Bovard to Tousignant of the bill of sale made by them to him, does not, of itself and alone, operate to convey to Maher & Tousignant any interest in the property in controversy." The court refused to give this instruction as asked; but modified and amended the same by adding thereto the words: "To operate as a conveyance the property must have been either in plaintiffs' possession, or delivered to them at the

time of the return of the bill of sale, or at some time prior to the levy of the execution."

The court also erred in excluding the sworn complaint of the witness Bovard, filed December 22, 1877, wherein he swore, without any qualification, that he was the absolute owner of the property, it having been previously shown by the testimony of Maher that he (Maher) knew of and consented to Bovard's filing of that complaint.

The court erred in ruling out the conversation of Bovard with the witness Stadtmuller, to the effect that he (Bovard) owned the property, and that Stadtmuller & Co. might do the best they could to collect their debt of Maher & Tousignant. The court erred in excluding the conversations and declarations of Bovard as to his ownership of the property, as made to the witness Hoover and other parties.

The testimony excluded by the court was admissible for the purpose of enabling the jury to arrive at the truth of the whole transaction. It tended materially to strengthen the position that there was a concert of action between the plaintiffs and Bovard to conceal the truth, and thereby defraud the creditors of the respective parties.

It was also admissible for another purpose. It tended to impeach the testimony of the witness Bovard, as given on the trial, to the effect that he held the property as security for the payment of the sum of one thousand dollars.

The views already expressed reach the merits of this controversy and render it unnecessary to examine or decide the question whether or not the court erred in excluding certain testimony tending to bring the facts of this case within the general rules of an equitable estoppel, as argued by the respective counsel.

One other question remains to be noticed. The suit of *Bovard* v. *Elder* was referred to a referee, who found the facts, conclusions of law, and reported a judgment in favor of Elder. The judgment in the record purports to be the judgment of the referee. It does not appear to have been entered by order of the court.

When the judgment-roll in that case was offered in evidence by the defendant, the proofs as to its correctness

were expressly waived by the plaintiff's counsel; but they objected to its admission because it did not appear to have been entered by order of the court. The court below overruled the objection and admitted the judgment-roll in evidence. Respondents claim that this action of the court was erroneous.

Even if it was admitted that the court erred, it would not justify an affirmance of the judgment entered in this case. Appellant would have the right to offer the proofs upon another trial, and to show, if he could, that the judgment was entered by order of the court.

We might dispose of this question by simply saying that it is not properly before us for decision. We are only called upon to dispose of such questions as are assigned as error by the appellant. It is not the rule of appellate courts to look into the errors, if any, that may have been committed against the respondent. (*Jackson* v. *Feather River Water Co.* 14 Cal. 18; *Seward* v. *Malotte,* 15 Id. 304; *Paul* v. *Magee,* 18 Id. 698.) We deem it proper, however, to add that we are of the impression, from the cursory examination we have made, that it is not necessary to the validity of such a judgment that it should appear to have been entered by order of the court. (Civil Practice Act, sec. 189.) It will be time enough to decide the question when it is properly presented.

The judgment of the district court is reversed and the cause remanded for a new trial.